## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mohamed Elsherif,                                   Civil No. 18-2998 (DWF/KMM)

                    Plaintiff,                               **REDACTED**
                                                          **MEMORANDUM**
v.                                                    **OPINION AND ORDER**

Mayo Clinic and Robert J. Spinner,

                    Defendants.

---

Vytas M. Rimas, Esq., Rimas Law Firm, PLLC, counsel for Plaintiff.

George R. Wood, Esq., Katherine Nyquist, Esq., and Stephanie D. Sarantopoulos, Esq., Littler Mendelson, PC, counsel for Defendants.

---

### INTRODUCTION

This matter is before the Court on Defendants Mayo Clinic ("Mayo") and Robert J. Spinner's ("Spinner") (collectively, "Defendants") Motion for Summary Judgment. (Doc. No. 323 ("Motion").) For the reasons set forth below, the Court grants Defendants' Motion.

### BACKGROUND

Plaintiff Mohamed Elsherif ("Elsherif") alleges a variety of both state and federal claims including discrimination, interference with leave, violation of fair labor standards, unjust enrichment, quantum meruit, promissory estoppel, tortious interference, defamation, civil theft, and conversion that arise from his work as a research fellow at Mayo.

Elsherif was born in Egypt and is a practicing Muslim.  (Doc. No. 326 ("Elsherif Dep.") at 239; *see also* Doc. No. 5 ("Am. Compl.") ¶ 8.)  He received a medical degree from Tanta University in 2010 but has not taken the examinations required to practice medicine in the United States.  (Elsherif Dep. at 17, 18, 20, 82-83; *see also* Doc. No. 332 ("Wood Decl., Ex. 4") at 65.)[1]  From August 3, 2016 to August 2, 2017, Elsherif worked as a self-funded postdoctoral research fellow at Mayo under the supervision of Defendant Spinner ("First Appointment").[2]  (*See* Wood Decl., Ex. 4 at 69- 70, 72-73.)  During his First Appointment, Elsherif co-authored four articles on which he assisted with research.[3]  (Spinner Decl. ¶ 5.)  Toward the end of his First Appointment, Mayo offered Elsherif a second appointment to run to from August 3, 2016 to August 2, 2017 ("Second

---

[1]     Wood Decl., Ex. 4 includes numerous deposition exhibits.  (*See* Doc. No. 325 ¶ 5.) For ease of reference, the Court uses the ECF page number to cite the documents.

[2]     Pursuant to Elsherif's appointment agreement with Mayo, any funding Elsherif received was to be provided by an Egyptian corporation without any commitment by Mayo to supplement the support.  (Wood Decl., Ex. 4 at 69-70 ("First Appt. Agreement"); *see also id.* at 158.)  In September 2015, the corporation verified that it employed Elsherif as a Medical Resident in its Medical Education Department and paid him 22,895 Egyptian pounds per month.  (*Id.* at 72-73 ("First. Appt. Salary Verification").)

[3]     Spinner was pleased with Elsherif's work during the First Appointment.  (*See* Wood Decl., Ex. 4 at 140; *see also* Doc. No. 349-1("Rimas Decl. 2") at 4 ("Letter of Rec.").)  The Court notes that Rimas Decl. 2 includes numerous uncategorized documents.  For ease of reference, the Court uses the ECF page number to cite the relevant page numbers.

Appointment"), again under the supervision of Defendant Spinner.[4] (Wood Decl., Ex. 4 at 71.) The Second Appointment included an annual salary of $45,444 paid directly by Mayo. (*Id.*)

Early during the Second Appointment, Spinner became concerned about Elsherif's job performance. (Doc. No. 328 ("Spinner Dep.") at 118; Spinner Decl. ¶ 6.) Spinner asserts that he held multiple one-on-one counseling sessions with Elsherif to address his work performance. (Spinner Dep. at 119-120; Spinner Decl. ¶ 8.) In February 2017, Spinner informed Jennie A. Wilson ("Wilson"), Mayo Research Operations Manager, that Elsherif had failed to show up to work on multiple occasions.[5] (Wood Decl., Ex. 4 at 127.) On March 15, 2017, Spinner informed the Mayo Human Recourses Department that Elsherif was not meeting expectations. (Wood. Decl. Ex. 4 at 120.)

That same month, Elsherif disclosed to Spinner that he ██████████████████ ████████████████[6] (Elsherif Dep. at 137.) Spinner suggested that Elsherif may need to take time off. (*Id.* at 137.) Elsherif took time off in late March.[7] (*Id.* at 137-

---

[4]     As Spinner's research fellow, Elsherif's role was to research various neurologic problems to support the studies in which Spinner was engaged in. (Doc. No. 334 ("Spinner Decl.") ¶ 4.)

[5]     The record reflects that between February and March 2017, Elsherif applied to 27 different positions at various institutions including the University of Michigan and Ohio State University. (*See* Wood Decl., Ex. 4 at 10.)

[6]     ████████████████████████████████████████████████████
████████████████████████████████████████████████████

[7]     Elsherif's leave was approved from March 21-30. (Wood Decl., Ex. 4 at 118.)

138.)  Prior to the start of his leave, Spinner sent Elsherif multiple emails asking him to

provide a copy of his research data and manuscript so that Spinner could work on the

research while Elsherif was away.  (Wood Decl., Ex. 4 at 86.)  Elsherif did not do so.[8]

Elsherif did not return from his leave as scheduled and failed to communicate to

Spinner any reason for his delayed absence, ultimately resulting in temporary loss of his

computer privileges.[9]  (Spinner Dep. at 145-146; Spinner Decl. ¶ 7, Ex. 2; *see also* Wood

Decl., Ex. 4 at 57, 87, 127, 129.)  On April 6, Spinner and Wilson met with Elsherif to

discuss his work performance and job expectations.  (Wood Decl., Ex. 4 at 109, 127, 129;

*see also* Elsherif Dep. at 184-186.)  Elsherif alleges that when discussing his

performance, Spinner said to him in a mocking tone, "Let Allah help you."  (Elsherif

Dep. at 182, 186.)  According to documentation of that conversation, Spinner advised

that continued poor performance could result in termination.  (Wood Decl., Ex. 4 at 129.)

Elsherif contends that after he returned from vacation, Spinner was verbally

abusive to him on multiple occasions.  (Elsherif Dep. at 183-84, 189.)  Specifically,

---

[8]     It appears that Elsherif provided Spinner with the requested information after he returned on April 5 or 6, 2017.  (*See* Wood Decl., Ex. 4. at 57.)

[9]     Elsherif did not return to work or communicate with Spinner until April 5, 2017. (Wood Decl., Ex. 4 at 87, 129.)  He also missed a presentation he was scheduled to give on April 5.  (*See* Rimas Decl. 1, Ex. 2 at 48-49.)  While he contends that the person organizing the presentation canceled the presentation without his consent (Def. Memo. at 11), the record reflects that Elsherif contacted her on the morning of the presentation indicating that he was out of town, his plane was delayed, and he likely would not return in time for his presentation.  (*Id.*)  The organizer then stated that she would postpone his presentation if he did not return in time.  The Court clarifies this instance to reflect a consistent disparity between the record and how Elsherif portrays the record.

Elsherif contends that when he told Spinner that he did not feel well, Spinner responded that "you should be doing well; ████████████████████████████████████ (*Id.* at 184.) Elsherif also asserts that Spinner frequently told Elsherif that he should not be working at Mayo, that he was a failure even if he worked at McDonalds, and that he should go back to his country. (*Id.* at 189.) Elsherif further alleges that Spinner angrily told him more than once that he was wasting Spinner's [grant] money. (Elsherif Dep. at 143-44,189.)

On May 22, Elsherif did not show up for work and did not respond to emails. (*Id.* at 127.) On May 23, 2017, Elsherif emailed Spinner apologizing for not responding sooner and stating that he had been absent due to an appendectomy. (*Id.* at 75.) On May 24, 2017, Elsherif sent Spinner a text message stating that his surgeon "gave [him] two days off" and did not impose any work restrictions. (*Id.* at 77.) On May 27, 2017, after Spinner asked that Elsherif provide documentation from his surgeon that he was fit to work, Elsherif admitted via text message that he had lied about the appendectomy. (*Id.* at 81-84.) In the same exchange, Elsherif disclosed that the true reason for his absence was that he had suffered ████████████████████ (*Id.* at 81-84.)

Two days after his alleged appendectomy, and at the direction of Spinner, Elsherif met with █████████████████████████████████████ ████████████████████ (Elsherif Dep. at 135-136.) Elsherif used the opportunity to discuss and develop a plan to help with his ████████ (*Id.*) ███████████████████ ████████████████████████████ but advised Spinner via email that Elsherif could safely continue his work with the caveat that he may experience reduced

productivity and may need time off for medical appointments.  (Wood Decl., Ex. 4 at 76

("Vaughn Email").)  Between March and June 2017, Elsherif saw ████████████

█████████████, none of whom indicated any need for work restrictions.  (Elsherif

Dep. at 155-157.)

On May 31, 2017, Wilson and Jacque Wolf, a Senior Human Resources Advisor,

met with Elsherif to discuss the importance of Elsherif communicating his absences to

Spinner.[10]  (Wood Decl., Ex. 4 at 92, 111-113; *see also id* at 113-115 (emails discussing

planning for the meeting).)  According to documentation from that meeting Elsherif:  (1)

admitted that he had failed to meet expectations and offered to re-pay his salary in the

form of a donation to Spinner's research grant; (2) was actively involved with the

████████████████████████ programs; and (3) was informed that Mayo

would "accommodate a period of absence if [Elsherif] determine[d] that [was] needed"

and that "the decision about absence [was] up to him."  (*Id.* at 111.)  On the same day,

Spinner sent Wilson the following email:

> Have spoken to [Elsherif] at length again.  He has difficulty comprehending
> the gravity of his poor performance and his lack of professionalism.  He has
> promised yet again to provide me with the paper that he was supposed to
> give me many months ago.  He has promised it for Monday.  If this is not
> provided, he will have to be dismissed.

---

[10]    An agenda for the meeting included discussing Elsherif's future need for absences
and likely qualification for FMLA.  (Wood Decl., Ex. 4 at 112-113.)  The record does not
reflect whether this topic was discussed.  Elsherif contends that it was not.

(Doc. No. 343-2 ("Rimas Decl. 1, Ex. 2") at 45.)[11]

Elsherif continued to have sporadic absences from work in June. (Elsherif Dep. at 158.) He asserts that all of his absences were related to his ███████ and that on the days he did not come in or came in late, he worked additional hours to make up for his absences. (*Id.* at 161.) On June 13, 2017, Spinner informed Elsherif that his Second Appointment would not be renewed for a third year. (Spinner Dep. at 27-28.) On the same day, Elsherif emailed a different Mayo physician, Dr. Alejandro Rabinstein ("Rabinstein"), about becoming a research fellow with him. (Elsherif Dep. at 192; *see also* Wood Decl., Ex. 4 at131.) Elsherif understood that the position was unpaid but wished to pursue it because he thought it would require less responsibility. (Elsherif Dep. at 193.)

According to documentation from June 19, 2017, Spinner disclosed to Wilson that he did not feel Elsherif should continue in any position at Mayo and stated that he would attempt to contact Rabinstein to discuss the situation. (Wood Decl., Ex. 4 at 123-124.) Spinner also indicated that Elsherif was still not completing the work Spinner asked him to, despite multiple meetings to talk about it, and that Elsherif continued to promise that he would send Spinner data but failed to do so. (*Id.*)

On June 21, 2017, Elsherif posted to a Mayo community online message board that he had been under "tremendous stress for several months and [he] need[ed] a pause

---

[11]     The Court notes that Rimas Decl. 1, Ex. 2 includes numerous uncategorized documents. For ease of reference, the Court uses the ECF page number to cite the relevant page numbers.

from his current job" to work in "a hospital based non-stressful job," and sought advice on how to obtain such a position. (Wood Decl., Ex. 4 at 121; *see also* Rimas Decl. 1, Ex. 2 at 40- 41; *see also* Rimas Decl. 2 at 5.)

A human resources advisor flagged the posting and sent it to Wilson who responded, "Oh my. What can we do to help him? I really think he needs help. He needs to be talking to someone about his stress level and how to deal with it. Any ideas?" (Wood. Decl. Ex. 4 at 121.) Wilson then emailed Spinner stating, "I am talking to HR about how we might be able to help [Elsherif]. Being that he posted this, I don't think his stress/anxiety is a [sic] protected health information. He really needs to be talking to someone who can help him deal with his stress. [Elsherif's] ██████████ ████████████████████████████ (Rimas Decl. 1, Ex. 2 at 40.) Spinner responded, "I'm amazed he's posting all this. Thx for sharing," to which Wilson concluded "Yes. Doesn't make sense, if a person is thinking straight."[12] (Rimas Decl. 2 at 5.)

Spinner asserts that after Elsherif learned that his Second Appointment would not be extended, Elsherif effectively stopped coming to work. (Spinner Decl. ¶ 9.) Mayo subsequently terminated Elsherif's Second Appointment on July 7, 2017, approximately one month early. (Wood Decl., Ex. 4 at 332; *see also* Spinner Decl. ¶ 10; Doc. No. 349-1 at 2.) Mayo attempted to notify Elsherif of the decision on July 7, 2017; however,

---

[12]    The Court highlights this exchange because Elsherif construes it as a discriminatory animus for his protected status and Mayo's desire that he leave the country. (*See* Doc. No. 348 ("Elsherif Memo.") at 34-35.)

Elsherif did not show up for a scheduled meeting.  (*Id.* ¶10, Ex. 3; *see also* Wood Decl.,

Ex. 4 at 130.)  Elsherif was ultimately advised of the decision on July 13, 2017 by a

human resources advisor.  (Doc. No. 330 ("Pletta Dep") at 64.)  Elsherif told the human

resources advisor that the termination would not help his ███████ and that he "████

████████████  (Elsherif Dep. at 233; *see also* Pletta Dep. at 68-69.)  Elsherif left

the meeting to check himself into ████████████████████  (Elsherif

Dep. at 206, 233.)

On July 26, 2017, Elsherif emailed Rabinstein to follow up on the unpaid position.

(*See* Rimas Decl. 1, Ex. 2 at 74.)  On July 28, 2017, a human resources advisor

responded, "[a] decision, to end your appointment was made on July 6, 2017 for

performance issues, a determination was also made at that time, that you would not be

eligible for future appointments with Mayo Clinic."[13]  (*Id.*)  Elsherif responded, "No,

unacceptable!  I did performed [sic] very well for a year prior to my illness and was about

to get promoted by my delegate supervisor.  My decline in performance over last [sic]

few months has strong underlying curable medical condition for which i [sic] am

receiving proper care right now."  (*Id.* at 73.)

---

[13]     The record reflects that on June 30, 2017, Elsherif was made aware of a Mayo
policy not to transfer employees failing to meet performance expectations to other
departments.  (Doc. No. Rimas Decl. 2 at 6; *see also* Elsherif Dep. at 194.)

On September 7, 2017, Mayo sent Elsherif a letter explaining the reasons for his termination.[14]  (Wood Decl., Ex. 4 at 102.)  The reasons included:  (1) unacceptable performance and professionalism issues; (2) lack of responsiveness to numerous requests to discuss job performance; (3) multiple failures to complete projects and properly communicate; (4) dishonesty; and (5) failure to show up for required meeting on July 7, 2017 without rescheduling.  (*Id.*)

Elsherif contends that after he was dismissed, Spinner falsely accused him of trespass, wanting to kill Spinner, and failing to return data related to Spinner's research. (Elsherif Dep. at 202-206; *see also* Am. Compl. ¶ 164.)  He also claims that Spinner interfered with his job prospects at Ohio State University, the University of Michigan, and other departments at Mayo by dissuading people from hiring him.  (Elsherif Memo. at 6 (citing his own answer to Defendants' interrogatory); *see also* Am. Compl. ¶ 157). He further alleges that Spinner purposefully withheld publishing research that Elsherif contributed to. (*Id*. at 27-28; *see also* Am. Compl. ¶¶ 144-149.)  Finally, Elsherif alleges that Mayo stole his personal laptop computer and jump drive.[15]  (Elsherif Dep. at 224, 230; *see also* Am. Compl. ¶¶ 170-175.)

---

[14]    The explanatory letter appears to have been generated in response to Elsherif's request for his personnel file and Mayo's understanding that Elsherif was unhappy that the file did not include a document outlining the reasons his Second Appointment was terminated.  (*See* Wood Decl., Ex. 4 at 102.)

[15]    The record reflects that Mayo sent Elsherif a package containing his personal laptop approximately two months after he was terminated.  (Elsherif Dep. at 226; *see also* Wood Decl., Ex. 4 at 104.)

On January 8, 2018, Elsherif filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Mayo alleging that Mayo discriminated against him on the basis of his race, religion, national origin, and disability. (Doc. No. 344-1 ("Elsherif Decl.") at 73.)  After investigating, the EEOC dismissed the claim on July 27, 2018.  (*Id.* at 113.)

Elsherif filed the instant lawsuit on October 23, 2018.  (*See* Doc. No. 1.)  He alleges both federal and state law claims including interference with the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, (Count I); discrimination on the basis of disability and failure to accommodate in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§363A.01 (Counts II-V); discrimination on the basis of race, national origin, ethnicity, and religion in violation of 42 U.S.C. § 1981 and 42 U.S.C. §§ 2000 *et seq.* ("Title VII") (Counts VI-IX); violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the Minnesota Fair Labor Standards Act ("MFLSA"), Minn. Stat. §§ 177.23 *et seq.* (Counts XI-XII); unjust enrichment and quantum meruit (Counts XIII and XIV); promissory estoppel

(Count XV); tortious interference (Counts XV(2)-XVI)[16]; defamation (Count XVII); civil theft (Count XVIII) and conversion (Count XIX).[17]  (Am. Compl. at ¶¶ 56-175.)

## DISCUSSION

## I.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v.*

---

[16]    The Amended Complaint mistakenly includes two counts numbered "XV." (*See* Am. Compl. at 37-38.)  The Court refers to the second as XV(2) and does not renumber the remaining counts.

[17]    On April 5, 2019, the Court dismissed Elsherif's breach of contract claim (Count X).  (*See* Doc. No. 30.)

*Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment "may not rest upon mere allegation or denials

of his pleading but must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.   Disability Discrimination (Counts II and IV)

Elsherif alleges that Mayo discriminated against him because of his ███████.

(Am. Compl. ¶¶ 65-71, 80-86.)  The ADA and MHRA prohibit employers from

discriminating against employees based on disability.  42 U.S.C. § 12112(a); Minn.

Stat. § 363A.08, subd. 2.  Courts consider claims of disability discrimination under these

provisions simultaneously.  *See McCracken v. Carleton College*, 969 F. Supp. 2d 1118,

1129-30 (D. Minn. 2013).  To establish discrimination, a plaintiff may present either

direct or indirect evidence.  *See St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th

Cir. 2012).[18]

If the plaintiff relies on indirect evidence, he can "avoid summary judgment by

creating the requisite inference of unlawful discrimination through the *McDonnell*

---

[18]     While Elsherif contends that direct evidence supports his discrimination claims,
the Court finds that his allegations distort the record by taking statements out of context
and interjecting discriminatory animus that an accurate reading does not support.
(Elsherif Memo. at 34-35.)  "Direct evidence contains a specific link between a
discriminatory animus and the complained of employment decision, allowing [a]
reasonable fact finder to find the illegitimate criterion was the employer's actual
motivation for the decision."  *Gipson v. Dassault Falcon Jet Corp.*, 983 F.3d 377, 380
(8th Cir. 2020).  The Court finds that Elsherif presents no direct evidence which a
reasonable fact finder could construe as an illegitimate criterion for any adverse
employment action and declines to engage with the argument further.

*Douglas*[19] analysis, including sufficient evidence of pretext." *Id.* (citation omitted). Under this framework, the plaintiff must first establish a prima facie case by showing that (1) he was disabled within the meaning of the ADA, (2) he was qualified to perform the essential functions of the job, and (3) a causal connection exists between an adverse employment action and the disability. *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755-56 (8th Cir. 2016).

The plaintiff's burden at the prima facie stage "is quite low." *Orr v. City of Rogers*, 232 F. Supp. 3d 1052, 1066 (W.D. Ark. 2017) (citing *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998)). If he establishes a prima facie case, "[t]he burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's actions." *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010) (citation omitted). "If the employer articulates such a reason, the burden returns to the employee to show the employer's justification is a pretext" for discrimination. *Id.*

### A.   Prima Facie Case

Defendants argue that Elsherif's claims fail because he cannot establish any element of a prima facie case. (Doc. No. 339 ("Def. Memo.") at 17-20.) Specifically, they contend that Elsherif cannot prove that his ███████ had a substantial limitation on any major life activity because he does not allege that he was restricted in any way, none of the doctors that examined him opined that he required any work accommodations

---

[19]   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

other than attending medical appointments, and he has presented no evidence that he was substantially or materially limited in a major life activity while at Mayo.  (*Id.* at 17-18.)

Defendants argue further that Elsherif's repeated failures to show up for work during the Second Appointment and own acknowledgement of his poor performance demonstrate that he was not qualified to perform the essential functions of his job.  (*Id.* at 18-19.)  Finally, Defendants contend that the only adverse employment action Elsherif incurred was Mayo's decision not to extend his Second Appointment and Elsherif cannot establish a causal link between this action and his alleged disability.  (*Id.* at 18-19.)

Elsherif argues his ███████ is covered by the ADA because it impacted his ability to work.  (Elsherif Memo. at 29-31 (citing Elsherif Decl. at 3-46; Doc. No. 351 at 1-12; *see also* Vaughn Email).)  Moreover, he contends that he was qualified for his position because his work was excellent until he suffered from ███████.  (*Id.* at 31 (citing Letter of Rec.).)  Finally, Elsherif argues that a causal connection exists because of the temporal proximity between his disclosure that he suffered from a ███████ ██████████ and when his Second Appointment was not renewed.  (*Id.* at 33-34.)

The Court need only address the first element of Elsherif's prima facie case to conclude that it fails because his level of ██████ did not qualify as a disability.  The ADA defines a disability as:  "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."

42 U.S.C. § 12102(1).[20]  "This threshold inquiry requires an individualized analysis of the effects of the claimed impairment on the individual's life activities."  *Heisler v. Metro. Council*, 339 F.3d 622, 627 (8th Cir. 2003) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483 (1999)).

An impairment is substantially limiting if it renders a person unable to perform a major life activity that the average person in the general population can perform. 29 C.F.R. § 1630.2(j)(1)(ii) (2012).  *See also Heisler*, 339 F.3d at 627, *Cooper v. Olin Corp., Winchester Div.,* 246 F.3d 1083, 1088 (8th Cir.2001).  The impairment need not prevent or severely restrict the individual from performing a major life activity in order to be considered substantially limiting; however, not every impairment will constitute a disability.  29 C.F.R. § 1630.2(j)(1)(ii) (2012).

Major life activities include functions such as caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working.  29 C.F.R. § 1630.2(i) (2012).  The Supreme Court has instructed that courts analyze only those major life activities which the plaintiff asserts are limited by the claimed impairment.  *See Bragdon v. Abbott,* 524 U.S. 624, 638 (1998).

---

[20]    The applicable definition under the MHRA defines an individual with a disability as "any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment."  Minn. Stat. § 363A.03, subd. 12.

The record clearly reflects that Elsherif suffers from ███████. The Court recognizes that ████████ can sometimes be severe enough to qualify as a disability that substantially limits one or more major life activities. Here, Elsherif submits ████████ assessments that he asserts show a decline in his functional capacity. (*See* Doc. Nos. 350 ¶¶ 4-6; 351 at 1-12.) He also submits a single score from a Work Productivity and Activity Impairment Index to argue that his ████████ greatly impacted his work productivity. (*See* Elsherif Decl. at 34.) He does not submit any medical opinion or other documentation interpreting the scores. Moreover, he admits that none of the doctors that treated his ████████ advised any work restrictions or accommodations other than some level of decreased work productivity and time off to attend medical appointments. (Elsherif Dep. at 155-157.) The Court also notes that during the time Elsherif claims his impairment prevented him from working, he was able to submit 27 job applications. (*See* Wood Decl., Ex. 4 at 10.) Therefore, even construing the term "substantially limits" broadly, the Court finds insufficient evidence from which a reasonable jury could conclude that Elsherif's ████████ "substantially limited" his ability to work.[21] *Heisler*, 339 F.3d at 627; *Cooper*, at 1088; *Taylor v. Nimock's Oil Co*., 214 F.3d 957, 960–61 (8th Cir. 2000). Because Elsherif cannot establish a prima facie case of discrimination based on disability, the Court finds that Defendants are entitled to summary judgment on Elsherif's discrimination claims under the ADA and the MHRA.

---

[21]     Because the Court finds that Elsherif cannot establish the first element of his prima facie case, it need not consider the remaining elements.

## B.    Pretext

Furthermore, even if Elsherif could establish a prima facie case, the record does not support a finding that Defendants' stated reason for any adverse employment action was a pretext for discrimination.  Defendants assert that their decision for any adverse employment action was based on Elsherif's poor performance, absences, and dishonesty and argue that it was not pretext because Elsherif admitted to those deficiencies.  (Def. Memo. at 20-21.)

Elsherif argues that Mayo's stated reasons were pretext for discrimination because it did not follow its own policies with respect to the termination and non-renewal of his Second Appointment when it failed to provide him with written or final warnings regarding his work performance.  (Elsherif Memo. at 36.)  He also contends that Mayo selectively enforced its policies disparately among similarly situated research fellows, treating him differently because of his disability.  (*Id.*)  Finally, Elsherif argues that Mayo shifted its reason for terminating his Second Appointment.  (*Id.* at 37.)

"To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse action was false and that discrimination was the real reason." *Lors*, 595 F.3d at 834 (quoting *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008)).  At this stage, "[t]he plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Id.*  Pretext may be established by facts demonstrating that the employer did not follow standard policies in the plaintiff's situation or that comparable employees were treated differently.

18

*E.E.O.C. v. Fabricators, Inc.*, 763 F.3d 963, 970 (8th Cir. 2014).  In evaluating pretext, however, the Eighth Circuit has repeatedly acknowledged that "a federal court is not a super-personnel department with authority to review the wisdom or fairness of business judgments made by employers."  *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1118 (8th Cir. 2018); *see also Doucette v. Morrison Cty., Minn.*, 763 F.3d 978, 984 (8th Cir. 2014) ("It is not our role to question that [the employee's] errors were a problem for her employer.").

The Court finds that Elsherif has failed to identify evidence to demonstrate that Mayo's stated reason for any adverse employment action was false and that discrimination was the real reason.  The record reflects ample documentation of Elsherif's poor performance, lack of professionalism, and dishonesty during his Second Appointment.  (*See, e.g.,* Wood Decl., Ex. 4 at 75, 77, 87, 109, 120, 127, 129; Rimas Decl. 1, Ex. 2 at 48-49.)  This documentation includes uncommunicated absences, not returning from vacation as scheduled, missed meetings and presentations, and fabricating an appendectomy.  Moreover, Elsherif does not dispute his poor performance, absences, or dishonesty during the Second Appointment.  (*See* Elsherif Dep. at 130-133, 142-143, 158.)  Poor performance is a legitimate non-discriminatory reason to end an employment relationship.  *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014); *Hannoon v. Fawn Eng'g Corp.,* 324 F.3d 1041, 1047 (8th Cir.2003).  An employee's dishonesty is another legitimate non-discriminatory reason.  *Hanson v. Mental Health Res., Inc.*, 948 F. Supp. 2d 1034, 1045 (D. Minn. 2013).

Moreover, the Court finds insufficient evidence that Mayo did not apply or disparately applied its policies.  While Elsherif lists several policies he claims Defendants did not follow, he does not cite specific language from the policies that Defendants allegedly violated.  The Court declines to search for specific violations.  *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006).  Further, the record is replete with documentation that Elsherif was advised of his poor performance and that failure to improve may result in an adverse employment action.  As discussed above, he even admits his own poor performance.

Similarly, while Elsherif attempts to show that other research fellows were treated differently than him, he presents nothing more than bare allegations.  "At the pretext stage of the *McDonnell Douglas* burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one."  *Fiero*, 759 F.3d at 878 (citation omitted).  Elsherif does not point to any specific research fellow who was treated differently, nor show that any other research fellow was similarly situated in all relevant respects, including that their offenses were the same or of comparable seriousness.  *Id.*  Without specific evidence, his comparator argument fails.  *Id.*

Finally, the Court finds insufficient support for Elsherif's argument that Mayo shifted its reason for terminating his Second Appointment.  "Evidence of a substantial shift in an employer's explanation for an employment decision may be evidence of pretext, but an elaboration generally is not."  *Mervine v. Plant Eng'g Servs., LLC*, 859 F.3d 519, 528 (8th Cir. 2017) (internal quotation marks and citation omitted).  The record reflects that Mayo never changed their reason for terminating Elsherif's Second

Appointment; they simply provided a more complete depiction of what happened by clarifying that poor performance included dishonesty and lack of professionalism. (*Compare* Rimas Decl. 1, Ex. 2 at 74 *with* Wood Decl., Ex. 4 at 102.)

In short, the Court finds insufficient evidence by which a reasonable jury could infer "that discrimination was the real reason" for the termination and non-renewal of Elsherif's Second Appointment. *Lors*, 595 F.3d at 834 (citation omitted). Thus, for this additional reason, the Court concludes that Defendants are entitled to summary judgment on Elsherif's discrimination claims based on disability.

## III.   Failure to Accommodate (Counts III and V)

Elsherif further alleges that Mayo failed to provide a reasonable accommodation for his depression in violation of both the ADA and MHRA. (Am. Compl. ¶¶ 72-79, 87-94.) Under the ADA an employer must provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A). An employer's failure to make a reasonable accommodation is prohibited discrimination under both the ADA, *Peebles v. Potter,* 354 F.3d 761, 765 (8th Cir.2004), and the MHRA, Minn.Stat. § 363A.10, subd. 1. The Court analyzes an employer's liability under both provisions simultaneously. *McCracken*, 969 F. Supp. 2d at1129-30.

As discussed above, the Court finds that Elsherif cannot show that he was covered by the ADA or MHRA because the record does not support that his ███████ substantially or materially limited any major life activity. Accordingly, his claims based on failure to accommodate also fail. *Heisler*, 339 F.3d at 630.

21

Even if Elsherif could show that he had a disability, the Court notes that he was still required to ask for any accommodation he was requesting. *Mole v. Buckhorn Rubber Prod., Inc*., 165 F.3d 1212, 1217 (8th Cir. 1999) ("In general, it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed."). Here, the record does not reflect that Elsherif requested any type of accommodation. Elsherif admits that none of the ██████ who treated his ██████ advised any work restrictions. (Elsherif Dep. at 155-157.) The closest thing the Court can construe as an accommodation request is Vaughn's opinion that Elsherif may experience decreased work productivity and that he would likely need time off for medical appointments. (*See* Vaughn Email.) The record does not reflect that Elsherif was ever denied time off when he requested it. The record also reflects that Elsherif was given multiple opportunities to submit his research to Spinner but repeatedly failed to provide anything.

Because Elsherif did not have a qualifying disability, and because even if he did, he failed to ask for a specific accommodation, the Court finds that Defendants are entitled to summary judgment on Elsherif's claims based on failure to accommodate.

## IV.    Race, National Origin, Ethnicity, & Religious Discrimination (Counts VI-IX)

Elsherif also alleges that Mayo discriminated against him on the basis of his race, national origin, ethnicity, and religion in violation of 42 U.S.C. § 1981 and Title VII. (Am. Compl. ¶¶ 95-118.) Section 1981 protects "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613 (1987). Title VII

provides that it is "an unlawful employment practice for an employer . . . to . . . .

discharge any individual, or otherwise discriminate against any individual. . . because of

such individual's . . . race, color, religion . . . or national origin." 42 U.S.C.

§ 2000e-2(a)(1).

A plaintiff raising claims of employment discrimination may survive a motion for

summary judgment either by proof of "direct evidence" of discrimination, or by creating

the requisite inference of unlawful discrimination through the *McDonnell Douglas*

burden-shifting analysis described above. *See  E.E.O.C. v. Trans States Airlines, Inc*.,

462 F.3d 987, 991-96 (8th Cir. 2006).  "Direct evidence contains a specific link between

a discriminatory animus and the complained of employment decision, allowing [a]

reasonable fact finder to find the illegitimate criterion was the employer's actual

motivation for the decision." *Gipson*, 983 F.3d at 380.

### A.     Direct Evidence

Elsherif claims that several of Spinner's statements provide direct evidence that

Defendants unlawfully discriminated against him.   (Elsherif Memo. at 40.)  These

statements include Spinner's alleged assertions that:  (1) Elsherif "shouldn't be working

at Mayo"; (2) Elsherif "shouldn't be working in the entire country"; (3) Elsherif "should

go back to [his] country"; (4) Elsherif "was a failure even if he worked at McDonalds";

(5) Elsherif was "wasting his [expletive] [grant] money; and, (6) stating in a mocking

tone, "let Allah help [Elsherif]."  (*See* Elsherif Dep. at 143-44, 183-84, 189, 189.)

"Direct method cases are adjudicated based on the strength of affirmative evidence

of discriminatory motive." *Wagner v. Gallup, Inc*., 788 F.3d 877, 883 (8th Cir. 2015).

Here, the Court finds that Elsherif's direct evidence is too weak to establish a link between any adverse employment action and an alleged discriminatory motive.  While Elsherif claims that Wilson was present when Spinner allegedly stated, "let Allah help you," Elsherif presents nothing but his own unsubstantiated claim that Spinner made any of the statements.  Moreover, he did not depose Wilson, or support the allegation in any way other than his own assertion.  Accordingly, the Court finds insufficient evidence to create a triable issue of fact.  *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 855 (8th Cir. 2012); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994).

Even assuming that Spinner did make these statements, the Court finds insufficient evidence that they were motivated by a discriminatory animus.  Specifically, the alleged statements that Elsherif should not be working at Mayo, that he was a failure even if he worked at McDonalds, and that he was wasting Spinner's research grant money all relate to Elsherif's performance; not to any specific protected trait.  Moreover, there is nothing to connect Spinner's other alleged statements with any adverse employment action.  He provides no case law supporting his argument and does not offer an independent analysis. *Wagner*, 788 F.3d at 883.  Further, the Eighth Circuit has long established that "[s]tray remarks made in the workplace are not sufficient to establish a claim of discrimination." *Simmons v. Oce–USA, Inc.*, 174 F.3d 913, 915 (8th Cir.1999); *see also Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir.2000); *Kriss v. Sprint Commc'ns Co., Ltd. P'ship,* 58 F.3d 1276, 1282 (8th Cir. 1995).

B.    **Indirect Evidence**

While the Court finds that Elsherif presents insufficient direct evidence to support

any claim of employment discrimination, it also applies the *McDonnell Douglas* analysis

described above to determine whether he can create an inference of unlawful

discrimination through the burden-shifting framework.  *See Wagner*, 788 F.3d at 885.

To establish a prima facie case, Elsherif must show:  (1) he is a member of a

protected class because of his race, national origin, ethnicity, or religious beliefs; (2) he

met his employer's legitimate expectations; (3) he suffered an adverse employment

action, and (4) the circumstances give rise to an inference of discrimination.  *Shirrell v.*

*St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015).

Defendants argue that Elsherif cannot establish a prima facie case because he was

not meeting Mayo's legitimate expectations and because there is no evidence to suggest a

discriminatory inference.  (Def. Memo. at 24-25.)  Moreover, Defendants argue that

Elsherif's claims fail because there was a legitimate nondiscriminatory reason for any

adverse employment action.  (*Id.* at 25.)  The Court agrees.

As discussed above, the record reflects multiple instances of Elsherif failing to

meet legitimate expectations including uncommunicated absences, not returning from

vacation as scheduled, missed meetings and presentations, and fabricating an

appendectomy.  Even viewing the evidence in the light most favorable to Elsherif, the

Court finds insufficient evidence to show that he was meeting legitimate expectations.

*Pearson v. U.S. Bank Nat. Ass'n*, Civ. No. 13-889, 2014 WL 4163020, at *15 (D. Minn.,

Aug. 21, 2014); *see also Gifford v. Target Corp.*, Civ. No. 102049, 2011 WL 3876420, at *9 (D. Minn., Aug. 31, 2011).

Moreover, the Court finds insufficient evidence to support a causal connection between Elsherif's race, national origin, religion, or ethnicity and any adverse employment action. Again, as discussed above, Elsherif admits his poor performance, and the record is replete with documentation that Elsherif was advised that failure to improve may result in his termination. Without a causal connection, Elsherif cannot establish a prima facie case. *Buettner v. Eastern Arch Coal Sales Co.*, 216 F.3d 707, 715 (8th Cir. 2000).

Even if Elsherif could establish a prima facie case, the Court has already found that Defendants had a legitimate nondiscriminatory reason to terminate and not renew Elsherif's Second Appointment. The same analysis applies here.

Because Elsherif presents insufficient direct evidence to support his claims, and because he cannot meet his burden under the *McDonnell Douglas* burden-shifting framework, the Court concludes that Defendants are entitled to summary judgment on Elsherif's discrimination claims related to race, national origin, ethnicity, and religion under Section 1981 and Title VII.

## V.    FMLA Interference (Count I)

Elsherif further contends that Defendants interfered with his FMLA rights. (Am. Comp. ¶¶ 56-64.) The FMLA provides eligible employees with up to twelve weeks of unpaid leave during any twelve-month period if they have a serious health condition that makes them unable to perform the functions of their position. 29 U.S.C. § 2615(a)(1)(D).

26

Under the statute, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1).

Before taking leave, an employee requesting FMLA leave is required to give notice to the employer. 29 C.F.R. § 825.302(a). Notice is valid if it is "sufficient to make the employer aware that the employee needs FMLA qualifying leave." 29 C.F.R. § 825.303(a); § 825.302(c). An employee is not required to "expressly assert rights under the FMLA or even mention the FMLA." *Id.* "[T]he employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir.1999), *cert. denied,* 528 U.S. 1050 (1999).

The FMLA recognizes two types of claims by employees: interference and retaliation. *Phillips v. Matthews*, 547 F.3d 905, 909 (8th Cir. 2008). Under an interference theory, "[a]n employee can prevail . . . if he was denied substantive rights under the FMLA for a reason connected to his FMLA leave." *Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012) (internal citation and quotation marks omitted). This includes "manipulation by a covered employer to avoid responsibilities under FMLA." 29 C.F.R. § 825.220(b). However, the FMLA does not provide relief "unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002.)

An employee has the initial burden of proof to "show only that he or she was entitled to the benefit denied." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th

Cir. 2006) (internal citation and quotation marks omitted).  "The employer's intent is immaterial."  *Ballato*, 676 F.3d at 772.  Notwithstanding, the FMLA does not impose strict liability on employers for interference claims.  *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir.2005).  If there exists a showing of interference, the burden shifts to the employer to prove there was a reason unrelated to the employee's exercise of FMLA rights for terminating the employee.  *Id.* at 978–79; 29 C.F.R. § 825.216(a)(1).

Elsherif essentially argues that Mayo should have known that he was entitled to FMLA benefits and failed in its duty to inform him of those benefits.  (Elsherif Memo. at 15-17.)  Defendants argue that Elsherif failed to provide notice to trigger FMLA and that even if he did, his claim fails because any adverse action related to his employment was unrelated to his FMLA rights.  (Def. Memo. at 23.)

"[T]he employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave."  *Browning*, 178 F.3d at 1049.  The record reflects that both Spinner and human resources were aware that Elsherif ██████████████████████████████ ████████████ and that may qualify for FMLA leave.  The record also reflects that Elsherif was encouraged to take time off and was never denied any request to take time off.  Accordingly, even viewing the evidence in the light most favorable to Elsherif and assuming a reasonable jury could find that Mayo failed to properly inform him of his rights after giving proper notice, the Court finds that his claim fails because he cannot show that he suffered any harm.  *Ragsdale*, 535 U.S. at 89.

Moreover, as discussed above, Mayo had a legitimate reason for any adverse employment action that was completely unrelated to his FMLA rights. *Throneberry*, 403 F.3d at 979. Therefore, because Elsherif was not harmed by any alleged interference and because his Second Appointment was not renewed for a legitimate reason unrelated to his FMLA rights, the Court finds that Elsherif's FMLA interference claim fails.

## VI.   Fair Labor Standards Violations (Counts XI and XII)

Elsherif also claims that Mayo violated the FLSA and MFLSA by failing to provide him proper compensation for his work. (Am. Compl. ¶¶ 127-136.) Under the FLSA, employers are generally required to pay employees overtime for work in excess of forty hours per week; however, they are not required to pay overtime to employees "employed in a bona fide . . . professional capacity." 29 U.S.C. §§ 206, 213. This exemption applies to employees whose primary duty "is the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction" compensated at a salary equating at least $684 per week. 29 C.F.R. §§ 541.300(a), 541.301.

Similarly, the MFLSA generally requires employees to be paid overtime for work in excess of forty-eight hours a week. Minn.Stat. § 177.25. Professional employees, however, are considered exempt under the MFLSA. Minn.Stat. § 177.23, subd. 7(6). Professional employees include those who receive at least $250 in weekly salary, perform work requiring advanced knowledge in a field of science or learning and consistently exercise discretion and judgment. Minn. R. § 5200.0210, subpart 1.

Both the FLSA and MFLSA define the concept of an "employer" broadly. *See* 29 U.S.C. § 203(d) (2018) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . "); *id.* § 203(g) ("'Employ' includes to suffer or permit to work."); Minn. Stat. § 177.23, subd. 5 ("'Employ' means to permit to work."); *id.* § 177.23, subd. 6 ("'Employer' means any individual, partnership, association, corporation, business trust, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee.").

Under both statutes, actions for the recovery of wages must be brought within two years unless the nonpayment is willful in which case plaintiff has an additional year. 29 U.S.C. § 255(a); Minn. Stat. § 541.07(5).  Under the FLSA, conduct is willful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." *Smith v. Heartland Auto. Servs., Inc.,* 418 F.Supp.2d 1129, 1141 (D. Minn. 2006) (citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988).  The MFLSA defines willful nonpayment as "the intentional and deliberate breach of an obligation to pay agreed upon wages." *Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 805 (Minn. 1989). !

Elsherif argues that Mayo did not pay him overtime for hours he worked on weekends and national holidays during both his First Appointment and Second Appointment.  (Elsherif Memo. at 41.)  Defendants argue that any claim arising during Elsherif's First Appointment fails because it is time barred and because he was not an

employee during that time.  (Def. Memo. at 25-26.)  They argue further that any claim

arising during Elsherif's Second Appointment fails because he was an exempt employee.

## A.    First Appointment

The record clearly reflects that Elsherif was employed by an Egyptian corporation

during his First Appointment and that Mayo did not provide him any funding.  (First

Appt. Agreement; Wood Decl., Ex. 4 at 72-73, 158.)  Elsherif does not address these

facts; however, he argues that Mayo employed him nonetheless.  (Elsherif Memo.

at 41-42.)  Elsherif supports his argument with a form Mayo submitted to the Social

Security Administration and Homeland Security which lists Elsherif as an employee

(Wood Decl., Ex. 4 at 154), a payroll note identifying Spinner as his sponsor (*id.* at 166),

his social security card (*id.* at 174), and a 2015 W-2 Wage and tax statement (Rimas

Decl. 1, Ex. 2 at17).[22]  (Elsherif Memo. at 41-42.)  He provides no case law or analysis

how these documents support his position.  Viewing the evidence in the light most

favorable to Elsherif, the Court finds that at best, he creates some inference that Mayo

may have been a joint employer.[23]  The Court need not reach this analysis, though,

---

[22]    The W2 form does not list any wages.  (*See* Rimas Decl. 1, Ex. 2 at 17.)

[23]    Elsherif provides no support or argument for the Court to analyze the economic
reality of his relationship with Mayo such that it may be liable under the FLSA or
MFLSA as a joint employer.  See Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005); Le v.
Regency Corp., 957 F. Supp. 2d 1079, 1089–90 (D. Minn. 2013).  This consideration
includes whether the alleged joint employer "(1) had the power to hire and fire the
employees; (2) supervised and controlled employee work schedules or conditions of
employment; (3) determined the rate and method of payment; and (4) maintained
employment records."  Catani v. Chiodi, Civ. No. 00-1559, 2001 WL 920025, at *6 (D.

because Elsherif has failed to present any evidence, caselaw, or argument that any alleged violation was willful.[24]  Accordingly, the Court finds that any claim arising during Elsherif's First Appointment is time barred.  *Placzek v. Mayo Clinic*, Civ. No. 18-2952, 2020 WL 3577620, *5 (D. Minn., July 1, 2020).

### B.    Second Appointment

The parties do not dispute that Mayo employed Elsherif and paid him an annual salary of $45,444 during his Second Appointment.  Elsherif contends that Spinner asked him to work on holidays and weekends, but Mayo did not pay him overtime for such work.[25]  (Elsherif Memo. at 42.)  Mayo argues that Elsherif was not entitled to overtime because he was a professionally exempt employee.  (Def. Memo. at 26; *see* Pletta Dep. at 72-73.)

---

Minn. Aug. 13, 2001) (citing Bonnette v. California Health & Welfare Agency, 704 F.2d 1465 (9th Cir. 1983)).

[24]    Even construing the record generously, there is simply insufficient evidence to support any allegation that Mayo willfully violated the FLSA or MFLSA.  At this stage in the proceedings, Elsherif must do more than simply assert a willful violation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." (internal citation and quotation marks omitted)).

[25]    Elsherif appears to argue his entitlement status based on a blanket statement in a request for remote access to Mayo's network that non-exempt employees must be paid overtime for their work.  (*See* Def. Memo. at 3-4 (citing Rimas Decl. 1, Ex. 2 at 43).)  He does not provide any argument or evidence that he was non-exempt or that the statement applied to him in any way.

The record reflects that as a research fellow, Elsherif performed neurosurgery research which required specialized medical training, and over which he was able to exercise control and discretion over.  Moreover, his annual salary of $45,444, which equates to approximately $874 per week, is well above the minimum salary necessary to qualify professionally exempt under either statute.  Therefore, the Court finds that Elsherif was properly classified as a professionally exempt employee under both the FLSA and the MFLSA and not entitled to overtime pay under either statute.  29 U.S.C. §§ 206, 213; Minn.Stat. § 177.23, subd. 7(6).

Because Elsherif cannot show any violation of the FLSA or MFLSA during either his First Appointment or Second Appointment, the Court finds that Defendants are entitled to summary judgment on these claims.

## VII.   Unjust enrichment and Quantum Meruit[26] (Counts XIII and XIV)

Elsherif further alleges that Mayo knowingly benefited from his work as a research fellow without paying for it and that he is entitled to recover the reasonable value of his research and resulting publications.  (Am. Compl. ¶¶ 137-143.)

### A.   Unjust Enrichment

"[T]o prevail on a claim for unjust enrichment, a claimant must establish an implied-in-fact or quasi-contract in which the defendant received a benefit of value that

---

[26]     Aside from some discussion in his fact section, Elsherif did not respond to Defendants' arguments with respect to his unjust enrichment, quantum meruit, promissory estoppel, civil theft, or conversion claims.  The Court addresses the claims nonetheless, as the record sufficiently reflects that there is nothing to sustain them.

unjustly enriched the defendant in a manner that is illegal or unlawful." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012) (citation omitted).

Elsherif alleges that Mayo was unjustly enriched by his research and resulting publications. (Am. Compl. ¶¶ 137-140.)  Defendants argue that his claim fails because he cannot prove any implied-in-fact or quasi-contract regarding his research.  (Def. Memo. at 33.)  They argue further that Elsherif was compensated for his work during both of his appointments and cannot prove he had any right to additional compensation to research that was published.  (*Id.*)  The Court agrees.

The record reflects that Elsherif was paid a salary during both his First and Second Appointments.  (First Appt. Salary Verification; Wood Decl., Ex. 4 at 71.)  There is nothing in the record to indicate that Elsherif had any right to additional compensation for any research or publication he contributed to during his work as a research fellow.  Accordingly, the Court finds that Elsherif's unjust enrichment claim fails because he presents no circumstances under which Mayo unjustly retained a benefit to which it was not entitled.

### B.   Quantum Meruit

To prove a claim in quantum meruit, a claimant must show:  "(1) that [ ] services were rendered; (2) under circumstances from which a promise to pay for them should be implied; and (3) their value." *Faricy Law Firm, P.A. v. API, Inc. Asbestos Settlement Tr.*, 912 N.W.2d 652, 658 (Minn. 2018) (quotation marks and citation omitted).  "Quantum meruit is restitution for the value of a benefit conferred in the absence of a contract under a theory of unjust enrichment." *Id.*  "Quantum meruit is simply a remedy that 'does not

arise absent a showing of unjust enrichment.'"  *Cummins Law Office, P.A. v. Norman Graphic Printing Co. Ltd.,* 826 F. Supp. 2d 1127, 1130 n.2 (D. Minn. 2011) (quoting *Horizon Eng'g Servs. Co. v. Lakes Entm't, Inc.*, Civ. No. A10–1682, 2011 WL 2303613, at *7 (Minn. Ct. App. June 13, 2011).

Elsherif's quantum meruit claim also focuses on his research.  (Am. Comp., ¶¶ 141-43.)  As discussed above, the Court finds that Elsherif's unjust enrichment claim fails because he presents no circumstances under which Mayo unjustly retained a benefit to which it was not entitled.  His quantum meruit claims fails for the same reason.

Accordingly, the Court finds that Defendants are entitled to summary judgment on Elsherif's unjust enrichment and quantum meruit claims.

## VIII.  Promissory Estoppel (Count XV)

Elsherif next claims that he suffered damages when Defendants failed to publish his research and resulting authored works after making a "clear and definite promise" to do so.  (Am. Compl. ¶¶ 144-149.)  Defendants argue that Elsherif cannot prove any such promise or reliance on the alleged promise.  (Def. Memo. at 31-32.)

"Promissory estoppel is an equitable doctrine that implies a contract in law when none exists in fact."  *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn.2000) (citation and internal quotation marks omitted).  To prevail on his claim, Elsherif must show that:  (1) Defendants made him a clear and definite promise to publish his research and resulting authored works; (2) Defendants intended to induce reliance and Elsherif in fact relied to his detriment; and (3) the promise must be enforced to prevent injustice.  *Id.*

35

The Court need address only the first element to conclude that Elsherif's claim fails as a matter of law.[27]  There is nothing in the record to support that Defendants made Elsherif a "clear and definite promise" to publish his research and resulting authored works.  As a research fellow, it is plausible that some of Elsherif's work could lead to publication; however, a job perk does not constitute a promise.  Even if Defendants told him at some point that his work would be published, such a statement is not a promise sufficiently clear and definite to be enforceable.  *Martens*, 616 N.W.2d at 746.  An enforceable promise requires specific terms and conditions.  *Id.*; *see also Ruud v. Great Plains Supply, Inc*, 526 N.W.2d 369, 372 (Minn. 1995); *Aberman v. Malden Mills Indus.*, *Inc.*, 414 N.W.2d 769, 771-72 (Minn. Ct. App. 1987).  Here, Elsherif fails to present any term or condition of Defendants' alleged promise to publish his research and resulting authored works.  Indeed, the only support Elsherif has for any promise at all is his own testimony.  Consequently, the Court finds that Defendants are entitled to summary judgment on Elsherif's promissory estoppel claim.

## IX.   Tortious interference (Counts XV(2)-XVI)

Elsherif further alleges that Spinner tortiously interfered with his employment at Mayo (Count XV(2)), and that Spinner and Mayo tortiously interfered with his prospective economic advantage by preventing him from getting other jobs (Count XVI). (Am. Compl. ¶¶ 150-161.)

---

[27]    The Court briefly notes that there is insufficient record evidence to support the remaining elements of the Elsherif's promissory estoppel claim.

## A.    Interference with Employment at Mayo

To prevail on his claim against Spinner, Elsherif must establish:  (1) the existence

of his contract with Mayo; (2) Spinner's knowledge of his contract; (3) intentional

procurement of its breach; (4) without justification; and (5) damages.  *Sysdyne Corp. v.*

*Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015).

Elsherif alleges that Spinner intentionally procured the breach of Elsherif's

employment contract with Mayo out of malice and bad faith.  (Am. Compl.  ¶¶ 150-154.)

Defendants argue that his claim fails because as Elsherif's supervisor, Spinner acted as a

representative of Mayo and within the scope of its powers.  (Def. Memo. at 29-30.)

The Court finds insufficient record evidence to support Elsherif's allegation.  The

record reflects that Spinner was Elsherif's supervisor, and that as a representative of

Mayo, he acted within the scope of its powers to end Elsherif's employment for a

legitimate nondiscriminatory reason.  (*See, e.g.,* Wood Decl., Ex. 4 at 75, 77, 87, 109,

120, 127, 129; Rimas Decl. 1, Ex. 2 at 48-49.)  Moreover, the record does not support any

allegation that Spinner's actions were motivated by malice or bad faith.  Under

Minnesota law, "a company officer, agent or employee is privileged to interfere with or

cause a breach of another employee's employment contract with the company, if that

person acts in good faith, whether competently or not, believing that his actions are in

furtherance of the company's business." *Nordling v. Northern State Power Co*., 478

N.W.2d 498, 505-06 (Minn. 1991).  Accordingly, the Court finds that Elsherif's tortious

interference claim against Spinner fails.

## B.     Interference with Prospective Job Opportunities

To prevail on his claim against Defendants for interfering with his prospective economic advantage, Elsherif must show:  (1) the existence of reasonable job opportunities; (2) Defendants' knowledge of his job opportunities; (3) that Defendants intentionally interfered with his job opportunities and the intentional interference is either independently tortious or in violation of a state or federal regulation; (4) that in the absence of Defendants' wrongful act, it is reasonable that Elsherif would obtained one of the job opportunities; and (5) that Elsherif sustained damages.  *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

Elsherif alleges that Defendants interfered with his job prospects at Ohio State University, the University of Michigan, and Mayo.  (Am. Compl. ¶ 157.)  He contends that Spinner "repeatedly threatened to sabotage his career" and made good on his threats by dissuading Ohio State University, the University of Michigan, and other departments at Mayo from hiring him.  (*Id.* ¶ 158.)  He specifically contends that Ohio State University revoked a position he had accepted after speaking with Spinner.  (*Id.* ¶ 159.)  Elsherif further alleges that Spinner and Mayo "refused to provide requested letters of recommendation and reference" on his behalf despite doing so for other research fellows.  (*Id.* ¶ 158.)  Defendants argue that Elsherif lacks evidence to support his claim.  (Def. Memo. at 30.)

The Court finds that the record simply does not support Elsherif's allegations. Elsherif admits that he was not qualified for the positions he applied to at Ohio State University and the University of Michigan because he had not taken the required

examinations to practice medicine in the United States.  (Elsherif Dep. at 80-83, 145-46.)

Moreover, the program director for the position at Ohio State University verified that she

never spoke with Spinner, and that Elsherif was not eligible for the position he applied to

because he lacked the necessary pre-requisites.  (*See* Doc. No. 337 ("Greene-Chandos

Decl.") ¶¶ 14-20.)  Elsherif also presents no evidence that Spinner or Mayo contacted

anyone at the University of Michigan, or otherwise interfered in anyway.[28]  Finally, the

record reflects that Elsherif was not eligible for the position at Mayo he claims he lost.

(*See* Rimas Decl. 1, Ex. 2 at 74.)  Moreover, Elsherif cannot show damages because the

position was unpaid.  (Elsherif Dep. at 193.)  Therefore, Elsherif's claim of interference

with prospective economic advantage also fails.

Because Elsherif cannot show tortious interference with either his employment

contract or with prospective job opportunities, the Court finds that Defendants are

entitled to summary judgment on these claims as well.

## X.    Defamation (Count XVII)

Elsherif claims that Spinner made several statements about him that Spinner knew

were untrue and that he knew or should have known would harm Elsherif.  (Am.

Compl. ¶ 164.)  The alleged false statements made to others include accusations that

Elsherif trespassed on Mayo's property, failed to return a database related to his research,

and that he was:  (1) homicidal; (2) unwell; (3) a liar; and (4) disliked by his team.  (*Id.*)

---

[28]    Elsherif admits that he has no personal knowledge of any alleged interference.
(Elsherif Dep. at 148-149.)

Elsherif specifically contends that Spinner made a number of defamatory comments about him to the director of the fellowship program he applied to Ohio State University. (*Id.*; *see also* Elsherif Memo. at 9.)  He also alleges that Spinner made a variety of derogatory statements to him that others overheard.  (Am. Compl. ¶ 164.)  Defendants argue that Elsherif has no evidence that Spinner or any other Mayo employee made defamatory comments about him.  (Def. Memo. at 28-29.)

To prove his claim of defamation, Elsherif must establish (1) a false statement (2) communicated to someone other than himself (3) which tends to harm his reputation or lower his esteem in the community.  *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn. 1980).

The Court finds that the record does not support his claim.  Specifically, there is insufficient evidence to support that Spinner made any of the alleged statements at all; Elsherif does not support his claim with anything but his own allegations.  Moreover, the record directly contradicts any allegation that Spinner spoke to the director of the fellowship program at Ohio University (Greene-Chandos Decl. ¶ 20), or that any alleged statement had any impact on why Elsherif was unable to participate in the fellowship program (*id.* ¶¶ 14-19).  Moreover, to the extent Spinner did say something negative about Elsherif with respect to trespass, returning the database related to his research, or why he was terminated, the Court finds that Spinner is protected by qualified privilege because there is nothing to indicate that he acted out of bad faith.  *Walker v. Wanner Eng'g, Inc.*, 867 F. Supp. 2d 1050, 1054 (D. Minn. 2012) (quoting *Stuempges,* 297 N.W.2d at 256-57) ("'A defamatory statement is covered by qualified privilege if made

in good faith and 'upon a proper occasion, from a proper motive, and . . based upon reasonable or probable cause.'").

Even viewing the evidence in the light most favorable to Elsherif, the Court finds that his defamation claims fail.  Consequently, Defendants are entitled to summary judgment on this claim as well.

## XI.   Civil Theft and Conversion (Counts Count XVIII XIX)

Finally, Elsherif alleges that Defendants are liable for conversion (Count XIX) and civil theft (Count XVIII) because they deprived him of his personal laptop computer and jump drive without his consent.  (Am. Compl. ¶¶ 170-175; Elsherif Memo. at 20-21.) Defendants argue that Elsherif's claims fail because he left his laptop at Mayo on July 13 and it was returned two months later, and because he cannot prove ownership over the jump drive.  (Def. Memo. at 16, 34.)

Under Minnesota law, conversion is defined as "an act of willful interference with the personal property of another which is without justification or which is inconsistent with the rights of the person entitled to the use, possession or ownership of the property." *Bloom v. Henn. Cnty.,* 783 F.Supp. 418, 440 (D. Minn. 1992) (quoting *Dain Bosworth, Inc. v. Goetze,* 374 N.W.2d 467, 471 (Minn. Ct. App. 1985)).  A plaintiff who prevails on a claim of conversion may seek punitive damages that are in addition to the value of converted property under Minn.Stat. § 604.14, which provides that "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater." Minn.Stat. § 604.14, subd. 1.

The Court once again finds that the record does not support Elsherif's claims. Specifically, the record reflects that Elsherif was terminated on July 7, 2017. (*See* Rimas Decl. 2 at 2.) On or before July 13, 2017, someone at Mayo collected Elsherif's personal belongings in a box. (Pletta Dep. at 101-102.) The box included his computer. (*Id.* at 102.) After learning that he was terminated during a meeting on July 13, 2017, Elsherif left the meeting to check himself into a hospital to address his ██████. (Elsherif Dep. at 206, 233.) He did not take his personal belongings with him. (Pletta Dep. at 103.) Mayo ultimately returned his laptop to him, along with some of his other belongings, via FedEx on September 8, 2017. (Elsherif Dep. at 226; *see also* Wood Decl., Ex. 4 at 104.) While a jump drive was not among the items returned, the record does not support that Elsherif owned the jump drive he claims Defendants deprived him of.[29] (Elsherif Dep. at 228-29, 232-33.) Moreover, the record does not support that any alleged deprivation or interference was willful.

Even viewing the evidence in the light most favorable to Elsherif, the Court finds that he cannot support either claim. Accordingly, the Court finds that Defendants are entitled to summary judgment on Elsherif's conversion and civil theft claims as well.

---

[29]     Elsherif admits that Mayo issued him the jump drive he now claims Defendants deprived him of; however, he claims that he owned the drive based on a signed agreement between he and Mayo. (Elsherif Decl. ¶ 24; Elsherif Dep. at 228-29-232-33.) Elsherif does not provide a copy of the agreement. Therefore, the Court cannot conclude that Elsherif rightfully owned the jump drive.

## CONCLUSION

For the reasons set forth above, the Court finds that Defendants are entitled to summary judgment on all of Elsherif's claims.  In brief, Elsherif's disability and protected status claims fail because he lacks direct evidence and cannot establish a prima facie case of discrimination.  Even if he could, the Court finds that Defendants had a legitimate nondiscriminatory reason for any adverse employment action.  Moreover, the Court finds that Elsherif's claims based on failure to accommodate fail because he cannot show that he was disabled and because even if he was disabled, he did not request any accommodation.  The Court also finds that Elsherif's FMLA interference claim fails because he was encouraged to take time off, and Defendants had a legitimate nondiscriminatory reason for any adverse employment action.  Additionally, the Court finds that his FLSA and MFLSA claims fail because Elsherif cannot show any willful violation.  Finally, the Court finds that Elsherif's unjust enrichment, quantum meruit, promissory estoppel, tortious interference, defamation, conversion, and civil theft claims fail because they are not supported by the record.

## ORDER

Based upon the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc.

No. [323]) is **GRANTED** in its entirety and Plaintiff's Amended Complaint (Doc.

No. [5]) is **DISMISSED WITH PREJUDICE**.

      **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 22, 2021                  s/Donovan W. Frank
                                                    DONOVAN W. FRANK
                                                    United States District Judge